UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CONSTANCE GRAHAM,

                                    Plaintiff,          **No. 6:10-CV-6645T**
                                                        **DECISION and ORDER**

            v.

ELMIRA CITY SCHOOL DISTRICT,
ELMIRA CITY SCHOOL DISTRICT, BOARD OF
EDUCATION,

                                    Defendants.
_____

## I.   Introduction

Constance Graham ("Plaintiff"), represented by counsel, instituted the present action against the Elmira City School District ("the District") and the Elmira City School District, Board of Education ("the Board") alleging employment discrimination under Title VII of the Civil Rights Act of 1964, § 701 <u>et</u> <u>seq.</u>, 42 U.S.C.A. § 2000e <u>et</u> <u>seq</u>. This Decision and Order addresses the motion filed by the District and the Board (collectively, "Defendants") seeking summary judgment.

## II.  Background

### A.   Factual Summary

In 2006, Plaintiff was recruited by District Superintendent Raymond Bryant ("Supt. Bryant") to apply for the principalship position at Diven Elementary School ("Diven"). At the August 15 2007, Board meeting Supt. Bryant recommended that she be hired as

principal of Diven. Board members Timothy Blandford, Michael Crimmins, Lynn Grottenthaler, Daniel Hurley, Rodney Strange, Ethel Stroman, Mary Beth Turner, and Anthony Fisher, Jr., voted unanimously (with one Board member absent and not voting) to approve Plaintiff's appointment. See Affidavit of Mary Beth Turner ("Turner Aff."), ¶ 4 & Exhibit ("Ex.") A, p. 111 (Dkt #38-5). Plaintiff understood that her position was probationary until such time as a decision was made about tenure. Graham Tr. 17:9-17.[1]

According to Director of Human Resources Robert Van Keuren ("Van Keuren"), Diven was affected by "generational poverty" and "a somewhat difficult staff led by a very strong [teachers'] union leader in that building." Van Keuren 7:11-17; id. 8:3-6. Van Keuren recalled hearing complaints about Plaintiff from Diven's teachers' union which "generically" stemmed from Plaintiff "trying to reestablish administrative control of the building[.]" Id. 9:2-11, 34:3-21. According to Plaintiff, some the teachers felt that a male principal was needed because of the discipline problem at Diven, id. 53:4-22, and they were opposed to her request to review their lesson plans. Id. 54:1-55:9. From the beginning, Plaintiff said she had an "antagonistic relationship" with Douglas Martin ("Martin"), the president of the teachers' union. Id. 55:20-56:16. Plaintiff felt

---

[1]

Deposition transcripts of witnesses in this case will be referred to using the witness's surname followed by the relevant page numbers. All deposition transcript pages cited in this Decision and Order were submitted by Defendants as exhibits (Dkt #38-4) in support of their motion for summary judgment (Dkt #38).

there was "some kind of collusion" between Martin and certain "veteran" teachers at Diven. Id. Over time, "[she] really got the sense that there was active undermining of [her] position as the administrative leader of the building with the teachers." Id. 57:15-18. Though Martin never made racist comments directly to Plaintiff, she "was made aware that he was talking with one of the veteran teachers in the building, [Chris] Troncone," who "felt uncomfortable working with, as [Troncone] put it, colored people." Id. 57:19-58:10. Plaintiff was not aware of any other members of the teachers' union making racist comments. Id. 80:18-23. Plaintiff testified that Supt. Bryant, Asst. Supt. Hochreiter, and Van Keuren did not make any racist comments or reference her race at any time. See id. 79:1-80:9, 122:1-8.

Board members and District administrators recounted hearing complaints from a number of parents with children at Diven that Plaintiff was a poor communicator and not engaged with staff, students, and the community. For instance, Board member Edith Stroman ("Stroman") testified that she consistently heard complaints from "a group of parents [who] had gotten together [and] decided they did not want her [at Diven] as a principal" because they did not like Plaintiff's leadership style. Id. 39:9-17. Stroman's understanding of the parents' complaints was that Plaintiff "stayed in her office. That she never came out. No one ever saw her. She didn't attend to their needs, the staff[s' needs]." Id. 39:22-40:21.

Stroman heard complaints that Plaintiff was aloof and did not interact well with the children. See also Turner Aff., ¶¶ 6-11 (Dkt #38-5).

Supt. Bryant testified receiving complaints from members of the Diven parents' group that Plaintiff was "hard to get ahold of" and "wasn't responsive to their inquiries[.]" Bryant 65:11-15. These parents complained that Plaintiff, unlike other administrators from Diven, would not attend the parents' group meetings to discuss issues with them. Id. 65:16-22. Teachers complained to him that Plaintiff spent an "inordinate amount of time" in her office and that as of three months after she had begun as principal, she had not held a faculty meeting or otherwise gone around and introduced herself to all the staff. Id. 78:24-79:16. Supt. Bryant opined that some of the complaints from teachers and aides were because Plaintiff was conducting business at Diven differently than her predecessors. Id. 64:22-65:2. Supt. Bryant agreed that one area in which she could improve was communications with staff. While Plaintiff was principal, fourteen staff members asked for transfers out of Diven due to her leadership style; this was a larger number than usual of transfer requests. Id. 66:21-67:2, 82:5-17.

Plaintiff testified that throughout the school year, her direct supervisor, Asst. Supt. Hochreiter, told her that he felt she needed to spend more time being involved with parents and the community as "there was a need particularly in [Diven] to have parents coming

-4-

in." Graham 49:11-15.

On June 17, 2008, Plaintiff was summoned, along with her union representative, to a meeting with Supt. Bryant, Asst. Supt. Hochreiter, and Van Keuren ("the District Administrators") where Plaintiff was informed her she was to be transferred out of her position as principal. Plaintiff said that the District Administrators' reason for the transfer "appeared to be around the issues with the parents which was something that they were aware of throughout the year[.]" Graham 89:4-21. According to Plaintiff, the District administrators "were aware of parents who were meeting with Mr. Wood [the former Board member] who was part of that other e-mail to say how can we get rid of her[.]" Id. 66:9-13. According to Plaintiff, Asst. Supt. Hochreiter's information concerning parent dissatisfaction with Plaintiff's performance was not from a survey that had been sent to parents, as the results were not in at that point, but "was directly coming from the parent group that was in the building" who were meeting with Wood "to figure out a way of ousting [her]." Id. 90:9-23. Plaintiff explained that the primary reason given [by Asst. Supt. Hochreiter] [was] the dissent or dissension by the parents[.]" Id. 94:1-5. There were no other reasons given to her for wanting to transfer her out the principalship position. Id. 94:6-10.

Supt. Bryant testified that he made the decision to remove Plaintiff because he "[c]ouldn't protect her" from several Board

members whom he said were "out to get her." Bryant 103:13-104:8. He
elaborated as follows:

> It was clear to me that there was nothing that Dr. Graham
> could do at Diven that would back off some people who
> wanted her out. And it was creating, you know, as long as
> there were teachers who still thought there was hope that
> if they complained to certain board members she would be
> removed, the Diven community would never settle. . . . So
> I felt that my only option for the school's sake . . .
> and for Dr. Graham was to try and find an alternative for
> her within the district.

Bryant 24:15-25:2. Supt. Bryant testified that due to the "outside
influences . . . going in to [Diven]" from Board members and
parents, he "did not think [Plaintiff] in that situation could
function." Bryant 105:12-22. The decision to remove her had nothing
to do with her performance, id. 25:3-6, which was "[t]ypical of a
first year principal." Id. 25:9; see also id. 28:14-15.

Plaintiff testified that, at the meeting, she did not voice any
concerns that race was involved in the decision to remove her
"because [the District administrators] were aware of a lot of the
reasons behind this particular kind of vitriol that was coming up.
. . ." Graham 96:22-97:22. Plaintiff recalled Van Keuren being
"apologetic" and recognizing that Diven was a "very challenging
school" due to "the negative kind of interactions which hadn't just
started with [Plaintiff] coming [to Diven,] definitely." Plaintiff
indicated that this negativity "was there before [she] got there
with parents and the teachers and the push back that they were
getting because teachers feeling that too much was being put on them

. . . and just a handful of vocal parents" who had been causing "turmoil" at Diven for a while. Id.

Initially, she was to be transferred to the position of assistant principal, which she rejected. She eventually agreed to being transferred to the position of deputy director of human resources, reporting to Van Keuren. Graham 98:1-99:23. At the July 16, 2008 Board meeting, Supt. Bryant presented a personnel packet recommending, among other things, that Plaintiff be appointed to the position of deputy director of human resources.[2] Bryant 113:19-114:8. The Board voted 5-4 to approve the personnel packet. See Turner Aff. Ex. B, p. 61; see also Defendants' Statement of Material Facts, ¶¶ 30-35 (Dkt #38-1).

Plaintiff was in the deputy director of human resources position for two years at a salary of $75,000, which was $8,000 less than her salary as principal. In September or October 2010, she was assigned to be a probationary assistant principal at Elmira Free Academy at a salary of $75,000. Due to budget constraints, she was laid off in June of 2011, but was called back to work as a part-time assistant principal at two schools in September 2011, at a salary of about $77,000. Again, due to budget constraints, she was laid off in June 2012. Other assistant principals were laid off at that time. Graham 125:1-15. In August 2012, she was hired by the New York State

---

[2]
    Supt. Bryant testified that an individual Board member has no authority to act for or on behalf of the Board. Bryant 76:4-6, 110:17-111:4.

Office of Children and Family Services and presently is working there. All of the District's administrators and principals for whom she had worked offered to give or gave her "very good letters of recommendation." Id. 132:12-23.

### B. Procedural Status

Following Defendants' Motion for Judgment on the Pleadings, the Court permitted Plaintiff's disparate treatment and retaliation claims to proceed, but dismissed her hostile work environment claim. Currently pending is Defendants' Motion for Summary Judgment (Dkt #38) dismissing the Amended Complaint (Dkt #19). In orders dated March 18, 2015 (Dkt #60), and August 29, 2014 (Dkt #52), the Court struck as untimely certain documents (Dkt ##45-1 through 45-7, 46, 47, and 48) filed by Plaintiff in opposition to the summary judgment motion. The only opposition papers from Plaintiff remaining on the docket are Plaintiff's Response to Defendant's Rule 56 Statement of Material Facts (Dkt. #44-1) and the Attorney Declaration (Dkt. #44-2). The documents cited in those pleadings (e.g., excerpts from deposition transcripts) are among the documents that have been stricken. For the reasons discussed below, the Motion for Summary Judgment is granted, and the Amended Complaint is dismissed.

### III. Judgment Standard

When the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment

-8-

as a matter of law, summary judgment is appropriate. <u>See</u> FED. R. CIV. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the movant has demonstrated that no genuine issue of material fact exists, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine* issue for trial.'" <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e); emphasis in original). In other words, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). "If the evidence [presented by the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Id.</u> at 249-50. A plaintiff cannot defeat a summary judgment motion simply by presenting "conclusory allegations or unsubstantiated speculation." <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted).

## IV.  Discussion

### A.    Hostile Work Environment

This Court previously dismissed Plaintiff's hostile work environment claim which was based on what Plaintiff described as "racially toxic commentary" as evidenced by five alleged comments by "Caucasian District employees." Proposed Amended Complaint ("PAC"), ¶ 14. The Court found that these comments did not "rise to the level of severity or pervasiveness that is necessary to

-9-

plausibly allege a cause of action for a hostile work environment." Order dated 7/14/11, p. 8 (citations omitted) (Dkt #18). For this and other reasons, the Court granted Defendants' motion for judgment on the pleadings with respect to Plaintiff's hostile work environment claims under both Federal and New York State law. Id. Ignoring the Court's ruling, Plaintiff used the identical wording to re-allege these comments in her Amended Complaint to support a hostile work environment claim. See Amended Complaint ("AC"), ¶ 13(E)(1)-(5) (Dkt #19). Plaintiff has offered no reason for the Court to deviate from its prior ruling, and the Court finds none. See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.") (internal quotations and citations omitted).

**B.  Disparate Treatment**

One of Plaintiff's two surviving claims is for racially disparate treatment in violation of Title VII, which makes it unlawful for an employer "to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). When an employee alleges racial discrimination based on a claim of disparate treatment, "[p]roof of intentional discrimination is required." Gonzalez v. Ingersoll Mill.

-10-

Mach. Co., 133 F.3d 1025, 1031 (7th Cir. 1998) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)). "An employee may demonstrate her employer's intentional discrimination by providing either direct or indirect evidence." Eiland v. Trinity Hosp., 150 F.3d 747, 751 (7th Cir. 1998). Plaintiffs relying on indirect evidence in a Title VII case must rely on the burden-shifting procedure set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citation omitted).

## 1. Indirect Evidence

In her Amended Complaint, Plaintiff has proceeded under an indirect theory of proof since she alleges that she "was in a protected class, was performing her job satisfactorily, and was fired when others outside the protected class were treated more favorably." Eiland, 150 F.3d at 751. Plaintiff accordingly "must show that she was similarly situated in all material respects to the individuals with whom she compares her treatment." Mandell, 316 F.3d at 379 (quotation omitted). In general, this "requires a reasonably close resemblance of the facts and circumstances" of the plaintiff's and the comparator's cases. . . ." Graham, 230 F.3d at 40 (citation omitted). While the question of whether two employees are "similarly situated" ordinarily is a question of fact, Mandell, 316 F.3d at 379, a court "can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong

met." <u>Harlen Assocs. v. Inc. Vill. of Mineola</u>, 273 F.3d 494, 499 n. 2 (2d Cir. 2001).

Here, Plaintiff has not identified with specificity any comparators for purposes of establishing discriminatory intent on the part of the District. Instead, she broadly asserts that as compared to other, unspecified Caucasian principals in the District, (1) she was not given an assistant principal during the relevant time period; (2) she was not given as long as four years to show that her school was making progress under her leadership; and (3) she was evaluated "more harshly". Plaintiff did not identify any of the "Caucasian principals" in the Amended Complaint. In his declaration (Dkt #44-1), Plaintiff's attorney mentions "Sandy Mattison[3] and every other Caucuasian administrator," Dkt #44-1, ¶ 20. However, the only record citation in support of this statement is to the Amended Complaint. Furthermore, this statement provides virtually no information as to how Sandy Mattison and Plaintiff were "similarly situated." Even if they both held positions that could be classified as administrative within the District, that is insufficient to show that they were "similarly situated in all material respects[,]" <u>Mandell</u>, 316 F.3d at 379, to her. As a number of courts in this Circuit have observed, "[a]lthough the ultimate

---

[3] It appears that Sandy Mattison was a former principal at Diven; Van Keuren testified that "the strong [teachers' union] presence" at Diven was why the District removed Mattison; he noted that "she was not asserting herself in an administrative capacity. She wasn't taking control of the building." Van Keuren 33:10-18.

burden in making a prima facie case is slight, the issue of whether fellow employees are similarly situated is somewhat strict." Brown v. Middaugh, 41 F. Supp.2d 172, 184 (N.D.N.Y. 1999) (discussing Graham and Shumway). Conclusory statements to the effect that similarly situated employees outside of the plaintiff's protected class were treated more favorably than the plaintiff have been held insufficient to defeat summary judgment. See, e.g., Chan v. NYU Downtown Hosp., No. 03 Civ. 3003(RMB), 2006 WL 345853, at *5-6 (S.D.N.Y. Feb. 14, 2006) (statements that Caucasian employees were treated differently were insufficient to make out prima facie case of race discrimination because plaintiff did not "identify any similarly situated individuals outside her protected class who were treated preferentially")). Because Plaintiff has provided no detail about the "Caucasian principals" whom she references in her Amended Complaint, she cannot establish that they were similarly situated. See Desir v. Board of Co-op. Educ. Servs. (BOCES) Nassau Cty., 803 F. Supp.2d 168, 180 (E.D.N.Y. 2011) (where the plaintiff "provided no detail" about comparator  employees, he "cannot establish that they were similarly situated") (footnote omitted).

Moreover, Plaintiff's deposition testimony contradicts her allegations with regard to the alleged denial of an assistant principal. Plaintiff worked at Diven from the beginning of the school year in 2007 until June 2008. In October 2007, a retired superintendent was assigned to Diven as an interim assistant

principal. This individual left in December 2007, but in January 2008, another retired superintendent came on as assistant principal. Graham 43:13-45:19. Therefore, contrary to her allegations, she was assigned an assistant principal during almost her entire tenure at Diven. And, with regard to being evaluated "more harshly" than other principals, Plaintiff admits that the performance evaluation she received from Asst. Supt. Hochreiter was "balanced," Graham 51:10-52:20, as discussed further below in Section IV.C.

### 2.   Direct Evidence

In the interest of completeness, the Court has considered whether the comments set forth in the allegations pertaining to Plaintiff's hostile work environment claim can be direct evidence of discriminatory intent for purposes of her disparate treatment claim. See Eiland, 150 F.3d at 750-51 (disparate-treatment plaintiff attempted to show direct evidence of discriminatory intent based on staff physician's racist comments about certain articles he brought to her and his other statements to her that negatively referred to African-Americans). "Racist comments may constitute evidence of an intent to discriminate, but only if a sufficient nexus exists between the comments and the termination decision." Brown v. AstraZeneca Pharmaceuticals, L.P., No. CV-03-6166(DGT), 2006 WL 2376380, at *7 (E.D.N.Y. Aug. 16, 2006) (citing Schreiber v. Worldco, LLC, 324 F. Supp.2d 512, 518 (S.D.N.Y. 2004)). Without more, "stray remarks, even if made by a decision maker, do not

-14-

constitute sufficient evidence to make out a case of employment discrimination." <u>Danzer v. Norden Sys.</u>, 151 F.3d 50, 56 (2d Cir. 1998) (citation omitted). Factors to be considered whether comments fall under the "stray remark" category are "(1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process." <u>Schreiber</u>, 324 F. Supp.2d at 519 (citations omitted).

First, the Amended Complaint alleged that "Caucasian District employees" have admitted to referring to African-Americans as n----- s, but Plaintiff's deposition testimony indicates that this alleged conduct was attributed to former Board member Robert Wood ("Wood"). Plaintiff testified that she learned in the Spring of 2008, that Wood had admitted to using the word "-----" in the presence of his supervisor, who was African-American, at Wood's job at the Elmira Psychiatric Center. Plaintiff never heard Wood use that term, however. Graham 71:4-13. Plaintiff testified that she contacted Wood's supervisor who confirmed this was true, and that Wood had been suspended as a result. Plaintiff could not recall the name of Wood's supervisor, who has not been deposed and has not submitted a sworn statement. Although the remark is discriminatory on its

face, the Court finds that it should be characterized as a stray comment because it was not directed toward Plaintiff, was not made by a decisionmaker or supervisor, and was not related to the decisionmaking process.

Second, the Amended Complaint asserted that "[a] Caucasian District employee admitted that his dog 'only barks at black people'". This remark apparently was made by a Board member, Dan Hurley ("Hurley"), not a District employee. Graham 77:11-21. Plaintiff did not hear it and was not aware of any other objectionable comments by Hurley. Graham 78:2-5. Supt. Bryant testified that Hurley made the comment to him at some point before Plaintiff was hired. Supt. Bryant was petting Hurley's dog and Hurley said, "[T]his is a funny dog. . . .[T]he only time he barks at people he doesn't know is black people and the only one he tries to bite is the mailman who is black." Bryant 130:10-131:9. Asked if he thought there was racial animus behind the remark, Supt. Bryant said he thought Hurley "just thought it was comical." Id. 131:15-16. The Court notes that it was unclear even to the hearer whether this remark was racially degrading or discriminatory. Even assuming a reasonable juror would view it as discriminatory, the Court finds that it should be deemed a non-probative stray remark since it was not made by a decisionmaker or a supervisor, it was made well before the employment decision at issue, it did not relate to Plaintiff or her job performance, and it was made wholly out of the

decisionmaking context.

Third, Plaintiff testified she was told by Board member Diane Brewer, on a date she could not recall, that Board member Lynn Grottenthaler ("Grottenthaler") said "something about laziness and shuffling and jiving in referring to [unspecified] black board members." Graham 74:15-75:3, 75:8-76:13. Plaintiff did not actually hear any comments by Grottenthaler, and was not aware of any other objectionable remarks by her. Id. 76:18-20. The Court's review of the excerpted deposition testimony indicates that Van Keuren testified that Asst. Supt. Hochreiter told him about a Board meeting where Grottenthaler leaned over to him while a female African-American Board member was talking "emotional[ly]" about some topic and whispered, "'I got to leave. I can't put up with this shuck and jive anymore.'" Van Keuren 21:3-24. Though "'[s]huck and jive' is a phrase with racial origins, "[t]here is some debate regarding whether this slang has crossed over into mainstream usage." United States v. Pendergraft, 297 F.3d 1198, 1211 (11th Cir. 2002) (citing Smith v. Farley, 59 F.3d 659, 664 (7th Cir. 1995) ("It is not even certain . . . that the reference to the witness's 'shucking and jiving' was racial in character.") (citations omitted)). To call into question whether Grottenthaler used the term with racial animus, Defendants submitted an affidavit from Board member Mary Beth Turner ("Turner") who stated that she heard Grottenthaler use the term "shuck and jive" in reference to white persons who were

"talking around an issue." <u>See</u> Turner Aff., ¶ 36 (Dkt #38-5). In any event, although Grottenthaler was a Board member at the relevant time, her use of the term "shuck and jive" did not relate to Plaintiff or her performance as principal at Diven, or to the decision to remove her from that position. Therefore, these slang references by Grottenthaler should be considered non-probative stray comments.

Fourth, the Amended Complaint asserted that "[w]hen discussing the Plaintiff, one Caucasian employee said they needed to 'get that ----- out of here'". At her deposition, Plaintiff clarified that this allegation again concerned former Board member Wood. Plaintiff stated she was "told later on by people who overheard a conversation, [that] [Wood] [was] talking about [her] being, [']you know, we need to get rid of that black bitch.[']" Graham 66:1-9. Plaintiff did not specify who told her about this conversation or who actually overheard Wood say this; nor did she say when it occurred. At the least, this statement constitutes hearsay within hearsay, which "is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in [the Federal Rules of Evidence]." <u>Carden v. Westinghouse Elec. Corp.</u>, 850 F.2d 996, 1002 (3d Cir. 1988). However, Plaintiff has not attempted to show how this evidence would be admissible at trial. It does not appear that Wood was a Board member at the time he made the statement, as his name does not

appear in any of the Board meeting minutes submitted by Defendants
to the Court. Wood's statement therefore would not be an admission
by party-opponent under Federal Rule of Evidence 801(d)(2)(D). Even
if it were, Plaintiff still would have the burden of establishing
a foundation identifying the persons who heard Wood make that
remark. Given that Plaintiff could not identify any of the
intermediaries who could relate what Wood, the declarant, said, the
Court cannot see how evidence as to this statement by Wood would be
admissible. See Green v. Harris Publications, Inc., 331 F. Supp.2d
180, 192 (S.D.N.Y. 2004) (declining to find admissible allegation
by plaintiff that an identified co-worker told plaintiff that there
was a rumor about plaintiff being the "token -----" in the office;
"Rumors are not evidence. Indeed, plaintiff cannot identify the
individual who made the statement or when the statement was made.")
(citing Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155,
160 (2d Cir. 1999) (summary judgment was granted on claim where
plaintiff's "statement as to what he 'was told' was hearsay that
would not be admissible at trial") (citing Fed. R. Civ. P. 56(e);
H. Sand & Co. v. Airtemp Corp., 934 F.2d 450, 454-55 (2d Cir.1991)
(hearsay assertion that would not be admissible if testified to at
trial is not competent material for a Rule 56 affidavit).

Fifth and lastly, the Amended Complaint alleged that "[a]
Caucasian employee who learned that the Plaintiff would be assigned
to his school building implied that he would like to avoid having

a 'colored person' serving as principal in his building". Plaintiff testified that she "was made aware" that Doug Martin ("Martin"), the teachers' union building representative, was talking with one of teacher Chris Troncone ("Troncone"), who "felt uncomfortable working with, as [Troncone] put it, colored people." Graham 57:19-58:10. Plaintiff did not hear Martin or Troncone make such comments and was not aware of any other members of the teachers' union making racially pejorative comments. Id. 80:18-23.  Though asked repeatedly how she was "made aware" of these conversations, Plaintiff could not identify any specific individuals who informed her of this information, stating vaguely that it "came through staff . . . [and] parents." Id. 58:11-59:20. Plaintiff admitted she could not recall how she learned the information about Troncone's alleged sentiments. Id. 61:9-17. Again, Plaintiff's statement about what she "was made aware of" was hearsay that would not be admissible at a trial. See Sarno, 183 F.3d at 160; Cedeck v. Hamiltonian Fed'l Savings and Loan Ass'n, 551 F.3d 1136, 1138 (8th Cir. 1977) (plaintiff's testimony as to what deceased branch manager had told plaintiff as to what he had been told concerning her application for promotion was hearsay within hearsay and not admissible as admission by party opponent where author of statement to branch manager was unknown).

### 3.  Summary

In sum, under the burden-shifting theory regarding her disparate treatment claim, Plaintiff has failed establish a prima

facie case in that she has failed to adduce sufficient facts from which a reasonable inference can be drawn that there are similarly-situated comparators outside her protected class who were treated more favorably than she. Indeed, Plaintiff's own deposition testimony contradicts her allegations regarding the less favorable treatment she received.

With regard to the direct-evidence theory, Plaintiff has failed to adduce competent evidence in admissible form showing discriminatory intent by District employees or Board members. Assuming the admissibility of evidence regarding the remarks discussed above, the Court nonetheless finds them to constitute non-probative stray remarks which do not lead to an inference of discrimination on the part of the ultimate decisionmakers, the District administrators.

### C.   Retaliation

The second of Plaintiff's two surviving claims alleges that she was subjected to retaliatory treatment on the basis of her race. "To establish a prima facie case of retaliation, an employee must show '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (quotation omitted), abrogated on other grounds, National R.R. Pass. Corp. v. Morgan, 536 U.S. 101 (2002).

Causation generally is a factual question. <u>See</u> <u>Davidson v. Chestnut</u>, 193 F.3d 144, 150 (2d Cir. 1999). Thus, the Court's task on summary judgment is to determine whether Plaintiff has alleged facts that could support a reasonable finding of a causal connection between her protected speech and the adverse employment action. <u>DePace v. Flaherty</u>, 183 F. Supp.2d 633 (S.D.N.Y. 2002). The required causal connection can be shown by means of facts supporting an inference that "the adverse employment action would not have been taken absent the employee's protected speech." <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir. 1999) (citation omitted), <u>abrogated</u> <u>on</u> <u>other grounds</u>, <u>Burlington Northern & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53 (2006).

With regard to protected activity, Plaintiff has alleged that she complained about discriminatory conduct and practices by "District employees." <u>See</u> AC, ¶ 19 (Dkt #19). Plaintiff's complaints could qualify as protected activity. <u>See</u>, <u>e.g.</u>, <u>Crawford v. Metropolitan Gov't of Nashville & Davidson County</u>, 555 U.S. 271, 129 S. Ct. 846, 851 (2009) (noting that when an employee "communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity") (emphasis in original) (internal quotation omitted).

One of the retaliatory acts alleged by Plaintiff in her Amended Complaint is that "shortly" after she "began to complain[,]" the District transferred her out the principalship position to the

deputy director of human resources position, which was non-tenure track and paid a lower salary. AC, ¶¶ 18(A), 19 (Dkt #19).

As Defendants point out, in her deposition testimony, Plaintiff admitted that the first time she complained about any racial discrimination was after a June 17, 2008 meeting with Asst. Supt Hochreiter:

> [District's Attorney:] When was the first time that you made any kind of complaint concerning your treatment in the workplace?
>
> [Plaintiff:] Well, I think the first time was in that letter [Deposition Exhibit 4] that I wrote following that first meeting in June that definitely laid out a lot of complaints about, you know.

Graham 106:10-23; see also id. 106:3-107:11. By the time of that June 2008 meeting, the decision to transfer her out of her position as principal had already been made by Supt. Bryant. See Graham 88:2-90:4, 95:1-5; Bryant 104:9-21, 104:22-105:22, 106:21-107:7. Given that chronology, Plaintiff is unable to show a causal connection between the protected activity and the adverse employment action. See John v. Kingsbrook Jewish Medical Center/Rutland Nursing Home, No. 11-CV-3624MKB, 2014 WL 1236804, at *20 (E.D.N.Y. Mar. 25, 2014) ("All of the adverse actions . . . occurred or began before any protected activity and, therefore, Plaintiff cannot rely on temporal proximity to support an inference of retaliation.") (collecting cases); cf. DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987) ("Proof of causal connection can be established

indirectly by showing that the protected activity was followed closely by discriminatory treatment.") (emphasis omitted). Plaintiff thus has failed to show a genuine issue of material fact regarding the element of causation. Furthermore, Plaintiff has not alleged that Supt. Bryant, Asst. Supt. Hochreiter, or Van Keuren harbored racial animus toward her or engaged in discriminatory conduct. See Graham 79:8-11, 80:5-9.

The other retaliatory act alleged by Plaintiff is that the District "[m]aliciously and intentionally placed documents in [her] personnel file which contained untrue and unfair depictions of [her] performance at work. . . ." AC, ¶ 18(B). The Supreme Court has held that while employer actions prohibited by Title VII's anti-discrimination provision are limited to conduct that affects the terms and conditions of employment, an action challenged under Title VII's anti-retaliation provision need not affect the terms and condition of employment in order to constitute unlawful retaliation. Burlington Northern & Santa Fe Ry. Co., 548 U.S. at 63-64. Thus, for the purposes of a retaliation claim, negative performance reviews can be an adverse employment action. E.g., Siddiqi v. New York City Health & Hospitals Corp., 572 F. Supp.2d 353, 372 (S.D.N.Y. 2008). However, Plaintiff's sworn deposition testimony fatally undermines her assertion that she suffered an adverse employment action. When asked by the District's lawyer if she knew which documents were placed in her personnel file that were either untrue or contained

-24-

unfair depictions of her performance, she conceded, "At this point I don't." Graham Tr. 138:20-139:6. On being shown an evaluation (Defendants' Ex. C, Dkt. #38-4) written by Asst. Supt. Hochreiter in August 2008, and asked if this was one of the objectionable documents to which she was referring, Plaintiff significantly walked back her assertion that District employees placed "untrue" or "unfair" statements in her file:

> I do think that the part that you highlighted [regarding her degree of collaboration with parents and the community] really needs to be considered something that *could potentially be damaging.*

Graham 139:20-24 (emphasis supplied), 51:13; see also Graham 139:25-140:22.[4] Then, she retreated from her initial statement that she disagreed with this particular statement, saying it "just appeared to be an area of improvement rather than a hard disagreement" between herself and the District. Graham 51:23-52:10. After reviewing the evaluation at her deposition, Plaintiff testified that there were no other areas with which she disagreed, and she offered the opinion that "to [her] it was a balanced evaluation." Graham 52:19-20. The Court is hard-pressed to see how a "balanced evaluation" can constitute an adverse employment action. Plaintiff's retaliation claim thus is contradicted by her own sworn statements. See AB ex rel. EF v. Rhinebeck Cent. Sch. Dist., 361 F. Supp.2d 312,

---

[4]

The comment in question reads as follows: "Throughout the year there were concerns from parents and DSO [Diven Support Organization] Leadership regarding your attendance and active participation in meetings and working with parents."

316 (S.D.N.Y. 2005) ("[J]ust as the court should not accept an affidavit that contradicts deposition testimony, it should also not allow inconsistent allegations made in a complaint to defeat summary judgment in the face of contradictory testimony either.") (citations omitted).

**V.   Conclusion**

For the reasons discussed above, Defendants' Motion for Summary Judgment (Dkt #38) is granted, and Plaintiff's Amended Complaint (Dkt #19) is dismissed in its entirety. The Clerk of the Court is requested to close this case.

**SO ORDERED.**

S/ Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    Rochester, New York
          March 25, 2015

-26-